FILED '06 JUL 27 16:41 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JACK GARRISON AND DEANNE GARRISON, | CV. 04-1331-PK |
| Plaintiffs, | FINDINGS & RECOMMENDATION/ ORDER |
| v. | |
| BALLY TOTAL FITNESS HOLDING CORPORATION, LEE S. HILLMAN AND JOHN W. DWYER, | |
| Defendants. | |

PAPAK, Magistrate Judge:

The plaintiffs filed this action against the defendants on September 17, 2004 alleging claims for: (1) violations of the Oregon Securities Act; (2) breach of contract; and (3) common law fraud. The breach of contract and fraud claims were dismissed by prior motion.

Pending before this court are summary judgment motions filed by the plaintiffs and separately by each defendant. Defendants Hillman and Dwyer also filed motions to strike, and

Page 1 - FINDINGS & RECOMMENDATION/ORDER

the plaintiffs have asked the court to certify two questions to the Oregon Supreme Court. For the reasons set forth below, the court recommends granting the defendants' motions for summary judgment, denying the remaining motions, and dismissing this case with prejudice.

## I. FACTUAL BACKGROUND

Because this is a Motion for Summary Judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in the non-moving party's favor. Reeves v. Sanderson Plumbing, 530 U.S. 133, 150 (2000). Because the court finds in favor of the defendants these facts are presented in the light most favorable to the plaintiffs.

Plaintiffs Jack and Deanne Garrison (the "Garrisons") were the founders and majority shareholders of Nautilus Plus of Oregon ("Nautilus"). In August 1999, Bally Total Fitness ("Bally's") approached the Garrisons about a potential acquisition of Nautilus. By November 1999, the parties had drafted a Stock Purchase Agreement (the "Agreement"), and after some negotiation the transaction ultimately closed on May 17, 2000. The parties structured the transaction so that Bally's would acquire all of the stock in Nautilus, and in return the Garrisons would receive stock in Bally's. During this period of time, Defendant Lee Hillman ("Hillman") was the CEO of Bally's and Defendant John Dwyer ("Dwyer") was Executive Vice President and CFO.

### A. Representations

In their Agreement, the parties made mutual representations and warranties to each other. In particular, Bally's represented and warranted that: (1) none of its SEC filings "contained or will contain any untrue statement of a material fact or omitted or will omit to state a material fact"; (2) its financial statements fairly present, "in all material respects, the consolidated

Page 2 - FINDINGS & RECOMMENDATION/ORDER

financial position and consolidated results of operations and cash flows" of Bally's; (3) its financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP"); and (4) all of Bally's SEC Reports "complied as to form in all material respects with the applicable requirements of the Securities Act and Exchange Act." (Decl. of Eliz. Schwartz, Ex. 1 at 38.)

At closing, Hillman also signed an Officer's Certificate that stated "[a]ll of the representations and warranties of [Bally's] contained in Article IV of the Agreement that are qualified as to materiality are true and correct, and those that are not so qualified are true and correct in all material respects." (Decl. of Jack Garrison, Ex. 3 at 1.)

B. Limitations Period

Article VIII of the Agreement is entitled "Indemnification." This section of the Agreement defines the rights, remedies and limitations of the parties with respect to not only third party claims, but also with respect to direct claims against each other.

In § 8.02, Bally's agreed to indemnify the Garrisons for "any inaccuracy or breach of any representation or warranty of [Bally's] contained in this Agreement." (Decl. of Eliz. Schwartz, Ex. 1 at 53.) However, § 8.06 places specific time limitations on the representations and warranties that the parties made to each other and on claims arising from those representations and warranties. That section provides in pertinent part:

> All of the representations and warranties of the Company and Sellers contained in this Agreement and any and all claims and causes of action for indemnification under this Article VIII with respect thereto shall terminate 18 months after the Closing Date.

(Id. at 49.) Thus, the parties agreed that all representations and warranties about the accuracy and

Page 3 - FINDINGS & RECOMMENDATION/ORDER

truthfulness of Bally's financial statements would expire 18 months after closing. In addition, the parties agreed that all claims and causes of action based on any inaccuracy or breach of the representations and warranties would expire 18 months after closing. That 18 month period of time ended on November 17, 2001.

### C. General Release

At the May 17, 2000 closing, the Garrisons each signed a "General Release and Waiver of Claims" (the "General Release"). (Decl. of Eliz. Schwartz, Exs. 5 & 6.) The Garrisons each agreed to release:

> any and all manner of actions, proceedings, claims, causes of action, suits . . . of any nature whatsoever, and of every kind and description, choate and inchoate, known or unknown, at law or in equity

which they had or might have in the future arising from, among other things, their "stock ownership, stock options, [or] other equity interests. . . ." Id. The Release specifically excluded any "rights and remedies arising out of or related to the Agreement." Id. Thus, the Garrisons released all claims related to their stock ownership except those that might arise out of the Agreement, in which case the terms of the Agreement would govern the claims.

### D. Restated Earnings for 1999

On April 28, 2004, Bally's issued a press release announcing that Dwyer had resigned as Executive Vice President and CFO. The press release also announced that the SEC Enforcement Division was investigating Bally's in connection with its accounting treatment of revenues from non-obligatory prepaid membership dues which improperly accelerated the recognition of income.

///

As a result of the SEC investigation and an internal investigation by Bally's, the company's financial statements for various years were restated. With respect to 1999 in particular, their original Form 10-K was not prepared in conformance with GAAP. The diluted earnings per share for 1999 were restated from a $1.56 gain to a $1.66 loss, and net revenues were restated from $861.1 million down to $658.1 million.

### E. Prior Ruling

The defendants filed successful motions to dismiss the Garrisons' breach of contract and fraud claims, but the defendants did not move against the securities claims. The basis for granting the motions to dismiss was the contractual 18 month limitation period contained in the Agreement. Judge Jelderks issued a Findings and Recommendation (No. 48, "F&R") holding that the "limitations specifically apply to <u>all</u> claims and causes of action for indemnification" and that the "provision is broad enough to apply to either a breach of contract or a tort claim." (F&R at p. 32.) The F&R was adopted by Judge Haggerty. (No. 58.)

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56.

When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. <u>Anderson</u>

v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. See Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. See Celotex Corp., 477 U.S. at 322-23; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, see Taylor, 880 F.2d at 1045; Leer v. Murphy, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, see Anderson, 477 U.S. at 249-50; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Taylor, 880 F.2d at 1045.

### III. ANALYSIS

All three defendants contend that the remaining Oregon Securities Law claims are barred because: (1) the 18 month limitation period in the Agreement applies to the securities claims; and (2) the Garrisons signed General Releases covering these claims.

Page 6 - FINDINGS & RECOMMENDATION/ORDER

### A. The 18 Month Limitations Period

The Oregon Securities Law prohibits inducing the purchase or sale of securities "by means of an untrue statement of a material fact or an omission to state a material fact." Or. Rev. Stat. § 59.115(1)(b) and § 59.127(1)(b). Whether the Garrisons can go forward with their Oregon Securities Law claims, then, depends in part upon the existence of an untrue statement or omission of material fact.

The statements the Garrisons primarily rely upon to support their claim are the representations in Bally's 1999 SEC filings and financial statements that were inaccurate. However, the parties unambiguously agreed that their mutual representations and warranties about the financial condition of their respective companies would expire 18 months after the May 17, 2000 closing. In other words, the Garrisons agreed that after November 17, 2001 passed they could no longer use or rely upon any representations or warranties provided by Bally in the Agreement.

Not only did the parties agree that the representations and warranties would expire 18 months after closing, but more importantly the parties agreed to the same 18 month expiration period for "any and all claims and causes of action" related to representations and warranties. Absent a controlling statute to the contrary, parties may contractually shorten a statute of limitations so long as the shortened period is reasonable. Order of United Commercial Travelers of America v. Wolf, 331 U.S. 586, 608 (1947); Biomass One, L.P. v. S.P. Constr., 103 Or. App. 521, 525-26, 799 P.2d 152, 154 (1990). It has already been decided in this case that the 18 month limitation period set forth in the Agreement is reasonable and that it bars the Garrisons' breach of contract and common law fraud claims.

Page 7 - FINDINGS & RECOMMENDATION/ORDER

The issue that remains, then, is whether there is a "controlling statute to the contrary" that would prohibit the parties from contractually shortening the statute of limitations for the securities claims. The court is aware of no such statute which either expressly or impliedly bars a shortened limitations period for claims under the Oregon Securities Law.

The Garrisons argue that the court should look to the analogous federal securities laws to imply a "no waiver" provision into the Oregon Securities Law. Under federal securities law and in the Uniform Securities Act, there are provisions that prohibit parties from waiving their rights under securities laws. The problem with the Garrison's argument is that the Oregon legislature did not adopt the "no waiver" provision of the Uniform Securities Act. This court cannot presume that the absence of the "no waiver" section was an inadvertent omission by the Oregon legislature. Nor can this court, sua sponte, insinuate a "no waiver" provision into Oregon's statutory scheme. See Or. Rev. Stat. § 174.010.[1] Accordingly, the Garrison's argument is unavailing.

The Garrisons also argue that Oregon law prohibits parties from contractually limiting their rights under statutes that are designed to protect the public as well as individuals. However, the Garrisons cite no case law to suggest this rule applies to the Oregon Securities Law and the facts of this case. To the contrary, the Oregon Supreme Court has unequivocally held that parties may contractually limit their rights under the Oregon Securities Law. Ristau v. Wescold, Inc., 318 Or. 383, 868 P.2d 1331 (1994) (parties can contractually waive and release their Oregon Securities Law claims).

---

[1] Or. Rev. Stat. § 174.010 provides that "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted."

Page 8 - FINDINGS & RECOMMENDATION/ORDER

Based on the foregoing, this court recommends granting the defendants' Motions for Summary Judgment because the Garrisons' securities law claims are barred by the 18 month limitation period of the Agreement.

B.  Statements Independent of the Agreement

The Garrisons contend that even if the 18 month limitation period bars their claims based on representations covered in the Agreement, they should nonetheless be able to proceed based on representations made independent of the Agreement. In particular, the Garrisons point to a February 9, 2000 fax which consisted of Bally's Consolidated Operating Statement and a press release which announced Bally's inaccurate financial results. In addition, the Garrisons allege that during negotiation of the Agreement, Hillman and Dwyer made positive statements about Bally's financial condition. Even if these are viable statements upon which a securities law claim could be based, and if they are not already barred by the 18 month limitation period, reliance on these statements is barred by the General Release.

Release agreements are contracts subject to rules of contract interpretation. Ristau v. Wescold, Inc., 318 Or. 383, 868 P.2d 1331 (1994). Under Oregon law, the first step in contract interpretation is to determine whether the provision at issue is ambiguous. Batzer Construction Inc. v. Boyer, 204 Or. App. 309, 315, 129 P.3d 773, 777 (2006). A provision is ambiguous if it is susceptible to more than one reasonable interpretation or it has no definite significance. Id. at 313, 129 P.3d at 776. The court should consider the text and context of a provision in determining whether it is ambiguous. Id. at 317, 129 P.3d at 778. In addition, the court is to consider extrinsic evidence of "the circumstances underlying the formation of the contract." Id. An unambiguous release agreement should be enforced according to its terms. Ristau, 318 Or. at

Page 9 - FINDINGS & RECOMMENDATION/ORDER

387, 868 P.2d at 1333.

The General Release unambiguously bars claims arising from the Garrisons' stock ownership. In the definition of "Claims" the General Release is specific in stating that it includes those claims arising from stock ownership. This encompasses claims brought under the Oregon Securities Law. When viewed in context of the General Release as a whole, as well as considering it in context of the Agreement, this is the only plausible interpretation that can be given in order to give effect to the plain language of the General Release. The General Release excludes from its reach claims arising under the Agreement. Thus, the General Release is consistent with the terms of the Agreement where the parties clearly intended to preserve claims arising under the Agreement (and subject them to the 18 month limitations period), and to extinguish other claims that existed at the time of the General Release. So, to the extent the Garrisons base their claims on statements made prior to the Agreement and to the extent their claims are based on their "stock ownership" those claims were extinguished by the General Release.

The Garrisons argue that the General Release is unambiguously limited to employment claims. However, that is an unreasonably narrow interpretation of this contract which would render other terms of it meaningless. Not only does the Garrisons' interpretation ignore that the General Release applies to claims arising from stock ownership, but it also neglects other specifically defined "Claims" unrelated to employment matters. For example, "Claims" is also defined to include matters "relating to payment of any attorneys' fees incurred by Releasor." (Decl. of Eliz. Schwartz, Exs. 5 & 6.) This is not limited to attorneys' fees incurred in prosecuting employment-related claims. In addition, the General Release goes on to define

Page 10 - FINDINGS & RECOMMENDATION/ORDER

"Claims" as those "based on any tort, whistleblower, personal injury, defamation, invasion of privacy, intentional infliction of emotion distress, violation of public policy, or retaliatory or wrongful discharge theory." (Id.) While whistleblower and wrongful discharge claims are employment-related claims, the term "any tort," for example, is not so limited. "Any tort" means "any tort," not any employment-related tort as the Garrisons' interpretation would have the court hold.

The contractual language and posture of this case is much like that in Ristau. In Ristau, in conjunction with a stock sale agreement the parties executed a release agreement barring "any and all claims, demands, rights, damages, expenses, loss of compensation, suits and causes of action, whether known or unknown, now existing." Ristau, 318 Or. at 385, 868 P.2d at 1332. The release in Ristau, like the General Release in this case, also specifically excluded from coverage claims that might arise under the stock sale agreement. Id. at 386, 868 P.2d at 1333. As a result, the Ristau release served to extinguish claims that arose prior to the stock sale agreement, but preserve those that might later arise under the agreement. In this case, the General Release is even more specific and unambiguous than Ristau in that it specifically includes claims arising from the Garrisons' stock ownership not arising under the Agreement.

Thus, to the extent the Garrisons attempt to base their claims on statements apart from the Agreement, they have released those claims. They did not release claims arising from the Agreement. However, those claims are subject to the 18 month limitations period which expired well before the Garrisons filed this lawsuit. Accordingly, summary judgment should be granted in favor of the defendants.

///

## IV. REMAINING MATTERS

### A. Plaintiffs' Motion for Certification of Questions to the Oregon Supreme Court

The Garrisons have asked this court to certify two questions of law to the Oregon Supreme Court:

> 1. Can a contractual provision in a stock purchase agreement which limits claims based on representations in connection with the sale or purchase of securities to an 18 month period, regardless of discovery, supplant the statutory limitations provisions of ORS 59.115(6) and ORS 59.127(6)?
>
> 2. Can parties to a stock sale waive their statutory rights under ORS 59.115 and ORS 59.127 through a contractual limitations period?

Before the Oregon Supreme Court will even consider whether to exercise its discretion to hear certified questions, five statutory criteria must be met: (1) the certification must come from a court designated by the statute; (2) the question must be one of law; (3) the applicable law must be Oregon law; (4) the question must be one that "may be determinative of the cause;" and (5) it must appear to the certifying court that there is no controlling precedent in the decisions of this court or the Oregon Court of Appeals. Or. Rev. Stat. § 28.200; <u>Western Helicopter Services, Inc. v. Rogerson Aircraft Corp.</u>, 311 Or. 361, 364, 811 P.2d 627, 630 (1991).

The first four requirements can be determined objectively by the certifying court prior to certification. <u>Id.</u> at 366, 811 P.2d at 631. The fifth requirement is subjective and the certifying court must satisfy itself that it is not certifying questions of law already controlled by existing Oregon appellate precedent. <u>Id.</u> Based on the analysis above, this court will not recommend certification because the questions presented are already controlled by Oregon law and further clarification by Oregon courts is not necessary.

Page 12 - FINDINGS & RECOMMENDATION/ORDER

B. Dwyer and Hillman's Motions to Strike

Defendants Hillman and Dwyer have separately filed three Motions to Strike certain of the Garrisons' exhibits. Their motions are denied as moot.

///

CONCLUSION

For the foregoing reasons, this court recommends that the plaintiffs' Motion for Summary Judgment (No. 91) be denied, and the defendants' Motions for Summary Judgment be granted and a judgment be entered dismissing this case with prejudice. In addition, it is ordered that the Motion to Certify Questions to the Oregon Supreme Court (No. 153) and the Motions to Strike (Nos. 113, 129, 130) are denied.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 10th, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 27th day of July, 2006.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 13 - FINDINGS & RECOMMENDATION/ORDER